wo

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kirk Lankford,<br><br>               Plaintiff,<br><br>v.<br><br>Joseph Taylor, et al.,<br><br>               Defendants. | No. CV 17-02797-PHX-DWL (JZB)<br><br>**ORDER** |

Plaintiff Kirk Lankford, who is currently confined in the Saguaro Correctional Center ("SCC") in Eloy, Arizona, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Assistant Warden Benjamin Griego, Unit Manager Jesus Guilin, Case Manager Weckwerth, Correctional Counselor C. Hoskins, and CoreCivic[1] move for summary judgment. (Doc. 37.) Plaintiff was informed of his rights and obligations to respond (Doc. 41) and opposes the motion (Doc. 55). For the following reasons, the Court will grant the motion in part, deny it in part, and order the parties to provide supplemental briefing concerning Count Seven.

**I.    Background**

Defendants removed this case from the Maricopa County Superior Court. (Doc. 1.) On screening the complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a First Amendment retaliation claim in Count Three against Guilin,

---

[1]     At the time Plaintiff filed the complaint, CoreCivic was known as the Corrections Corporation of America ("CCA"). The Court will refer to CCA as CoreCivic.

Weckwerth, Hoskins, and Griego; a free speech claim under the Arizona Constitution in Count Seven against Guilin, Weckwerth, Hoskins, and Griego; and a state-law conversion claim in Count Nine against Weckwerth, Hoskins, Guilin, Griego, and CoreCivic. (Doc. 13.) The Court dismissed the remaining claims and Defendants. (*Id.*)

In Count Three, Plaintiff alleges that Guilin, Weckwerth, and Hoskins violated his First Amendment rights by searching his property and confiscating it in retaliation for his filing of a lawsuit in 2015 against the State of Hawaii and other Hawaii officials in connection with his criminal conviction (hereinafter the "Hawaii Lawsuit").[2] (Doc 1-1 at 17-18.)[3] Plaintiff further claims that Griego ordered, authorized, and coordinated the search and confiscation. (*Id.*) In Count Seven, Plaintiff alleges that Guilin, Weckwerth, Hoskins, and Griego violated his right to free speech under the Arizona Constitution in retaliation for his filing of the Hawaii Lawsuit. (*Id.* at 22-25.) In Count Nine, Plaintiff alleges that Weckwerth, Hoskins, Guilin, Griego, and CoreCivic committed the tort of conversion with respect to property that was confiscated or damaged. (*Id.* at 28.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

---

[2] Plaintiff is a Hawaii Department of Public Safety ("DPS") prisoner who is incarcerated at SCC pursuant to a correctional services agreement between Hawaii DPS and CoreCivic. (Doc. 38 ¶ 2.)

[3] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

contention is material, *i.e.,* a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.,* the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.   Relevant Facts[4]

#### A.   The Hawaii Lawsuit

In February 2015, Plaintiff filed a Complaint in the Circuit Court of the State of Hawaii against various defendants involved in his Hawaii criminal proceeding, including the City and County of Honolulu, Department of the Prosecuting Attorney, and former and current City and County of Honolulu prosecuting attorneys. (Doc. 38-6.) Plaintiff kept notes regarding the Hawaii Lawsuit in his cell at SCC "in a manila envelope labeled to clearly indicate that the material therein pertained to" that lawsuit. (Doc. 1-1 at 6.) At the time of the April 6, 2016 search that forms the basis for Plaintiff's claims in this case, there had been no activity in the Hawaii Lawsuit for nearly three months—it had removed to federal court, then remanded back to state court, and the parties had completed briefing on

---

[4] Many of the "facts" asserted in Plaintiff's separate statement are unnecessarily detailed, irrelevant, repetitive, or wholly speculative and will therefore be omitted from the discussion of the relevant facts. Furthermore, many of the parties' facts concerning Plaintiff's disciplinary proceeding, property claim, and grievances are irrelevant to the Court's determinations for purposes of this Order and therefore will be omitted.

the defendants' motion to dismiss on January 8, 2016. (Doc. 38-6 at 2-5.) Currently, appellate proceedings with respect to the Hawaii Lawsuit are ongoing.[5] (Doc. 51 at 2-3.)

### B. CoreCivic and SCC Policy Regarding Property and Cell Searches

CoreCivic's policies and procedures governing prisoner property at SCC are set forth in CoreCivic/SCC Policy 14-6. (Doc. 38 ¶ 12.) Prisoners may possess certain personal and facility-issued property while at SCC, a list of which is set forth in the Allowable Personal Property List Form 14-6AA. (*Id.* ¶ 13.) A copy of the list is posted in each housing unit at SCC. (*Id.* ¶ 14.) Upon admission, each prisoner receives a handbook that also contains information regarding allowable personal property. (*Id.* ¶ 15.)

In addition to facility-issued property and property possessed at admission, prisoners may acquire additional personal property through the commissary and/or facility approved vendors. (*Id.* ¶ 16.) Allowable property in excess of the amount authorized by the Allowable Personal Property List is considered contraband and will be confiscated. (*Id.* ¶ 17.) Any property that has been altered or modified or that has had identifying marks removed or modified is considered contraband and is subject to confiscation. (*Id.* ¶ 18.) Any items in a prisoner's possession that have not been approved during admission, issued by the facility, purchased from the commissary/approved vendor, or previously authorized by the facility are considered contraband and will be confiscated. (*Id.* ¶ 19.)

Defendants assert that "nuisance contraband," or trash, is also subject to confiscation. (*Id.* ¶ 20.)[6] They further claim that excess blank facility forms are considered nuisance contraband and that the confiscation of nuisance contraband, trash, excess papers, and blank facility forms prevents prisoners from over-accumulating papers and trash in their cells, which could pose a fire or safety hazard, infringe on the rights of the prisoner's

---

[5] Plaintiff asserts that the proceedings in the Hawaii Lawsuit after the April 6, 2016 search are relevant to this case because the "active nature" of the Hawaii Lawsuit "means that Plaintiff's need to use the discovery process" in the Hawaii Lawsuit "persists." (Doc. 51 at 2-3.)

[6] The term "nuisance contraband" does not appear in the three pages of the Inmate Handbook that Defendants cite and attach to their separate statement. (Doc. 38-1 at 23-26.) In addition, the Inmate Handbook does not appear to state that excess blank forms are considered contraband. (*Id.*)

cellmate, or create a security risk. (*Id.* ¶¶ 21-22.)

Legal materials are allowable property and are subject to visual search for concealed contraband. (*Id.* ¶ 23.) SCC personnel are not permitted to read a prisoner's legal materials during a search, but personnel may "go through" a prisoner's legal materials to look for concealed contraband or non-legal documents or writings that could pose a threat to the safety and security of the facility. (*Id.* ¶ 24.) SCC personnel generally are not permitted to confiscate and/or dispose of a prisoner's legal materials unless the materials contain writings that could pose a threat to the safety and security of the facility. (*Id.* ¶ 25.)

Under SCC policy, "[f]requent, unannounced searches of inmates, cells, and other areas of the facility are conducted as often as necessary to promote the safety and security of the facility." (Doc. 38-1 at 23.) Searches are conducted "to detect and prevent the introduction of contraband, to recover missing or stolen property and to prevent escapes and other disturbances." (*Id.*) "Searches are to be conducted in a manner, which avoids unnecessary force or embarrassment" to the prisoner, but the prisoner's presence during the search is not required. (*Id.*) "Contraband" is defined as "any item or items possessed by an inmate or found within the facility which are not issued, sold in commissary, approved by the Warden or authorized by written facility policy." (*Id.*)

Searches of cells and holding areas may be performed unannounced, on an irregular basis and in an orderly manner. (Doc. 38 ¶ 25.) Cell searches may be conducted based on reasonable suspicion "or for no reason at all." (*Id.* ¶ 33.) Cell searches occur daily to maintain the safety and security of the facility, personnel, and prisoners. (*Id.* ¶ 34.) Cell searches consist of a "systematic, complete, and sweeping search of all property in the cell." (*Id.* ¶ 35.)

When a contraband item is found during a cell search, the SCC employee must confiscate the item, notify his or her supervisor of the discovery, and document the confiscation and disallowable property on the Disposition of Non-Allowable Property

Form, Form 14-6A. (*Id.* ¶ 37.)[7] A prisoner can designate the disposition of non-allowable contraband listed on Form 14-6A in one of several manners. (*Id.* ¶ 38.)[8]

The parties agree that a prisoner's personal property, with two potential exceptions, may not be confiscated, destroyed, or otherwise disposed of without notice to the prisoner according to Policy 14-6.4(B). (Doc. 38 ¶ 41; Doc. 51 at 5.) The disputed exceptions concern "nuisance contraband" and trash: Defendants contend these materials may be destroyed without notice to the prisoner, while Plaintiff correctly notes that the written policy doesn't appear to carve out an exception for these materials. (*Id.*)

During cell searches, if there is any evidence that a prisoner may have tampered with or is hiding contraband in a mechanical device, such as a typewriter, the mechanical device is confiscated and taken to the maintenance department or a supervisor for further inspection. (Doc. 38 ¶ 57.) The device is opened to ensure that a prisoner has not opened, altered, or tampered with the device to remove parts that could be made into a weapon and to ensure that the prisoner is not hiding or storing contraband in the device that would pose a safety and security threat to the facility. (*Id.* ¶ 58.) After the mechanical device is inspected, and if there is no evidence that its parts are missing or that it contains contraband, it is returned to the prisoner. (*Id.* ¶ 59.)

### C. The Search and Confiscation of Plaintiff's Property

The parties dispute whether and/or the extent to which Griego (the assistant warden) was involved in the decision to authorize the search of Plaintiff's cell on April 6, 2016. In their separate statement, Defendants assert that although Griego generally has the authority to order the search of an inmate's cell, Griego "has no recollection of whether he authorized or ordered" the search of Plaintiff's cell on April 6, 2016. (Doc. 38 ¶¶ 77, 80.) Plaintiff, meanwhile, asserts that he had a conversation with Griego in July 2016 during which Griego "acknowledge[ed] that he ordered/authorized the April 6, 2016 search," "stated that

---

[7] Plaintiff does not dispute the factual accuracy of paragraphs 31-37 of Defendants' separate statement. (Doc. 51 at 5.)

[8] The property may be (1) destroyed by facility staff; (2) mailed to an address designated by the prisoner; (3) donated to a local charity approved by the facility; and/or (4) picked up by a prisoner's visitor with prior approval from the warden. (Doc. 38 ¶ 38.)

he knew Plaintiff was going to file suit because of the search/confiscation," and "made threats to Plaintiff about the confiscation of Plaintiff's legal work." (Doc. 51 ¶¶ 79, 200.)[9]

In any event, it is undisputed that Defendants Guilin and Weckwerth searched Plaintiff's cell on April 6, 2016 and removed various items of personal property, including legal materials, a typewriter, and a photo album. (Doc. 38 ¶¶ 43, 48, 56, 64.) Plaintiff alleges that Defendant Hoskins also participated in the search (Doc. 51 ¶¶ 43, 180-81), but Hoskins denies any involvement (Doc. 38 ¶ 99.)

Plaintiff contends the search of his cell was "not an ordinary search" in comparison to other searches at SCC and shouldn't be characterized as a "cell search." (Doc. 51 at 10-11.) Among other things, Plaintiff contends that searches of prisoners' property are not ordinarily conducted between 1:40 pm and 3:00 pm, as the April 6, 2016 search was, and are not ordinarily performed by unit managers like Guilin. (*Id.* at 11.) Also, Plaintiff contends that searches of prisoners' property are not ordinarily preceded by the removal of all of the prisoner's legal materials from his cell to the multipurpose room of his housing unit, unless the prisoner is being rehoused. (*Id.*) Defendants dispute that the search of Plaintiff's cell was "extraordinary" and assert that Guilin and Weckwerth conducted an unannounced search of Plaintiff's cell pursuant to SCC policy. (Doc. 38 ¶¶ 43, 75.) Guilin and Weckwerth state in declarations that they do not recall the exact reason for searching Plaintiff's cell but note that Plaintiff had "a history of possessing excess property and nuisance contraband in his cell in contravention of facility policy" and had "been suspected

---

[9] In their reply, Defendants urge the Court to disregard the portions of Plaintiff's separate statement concerning his alleged July 2016 conversation with Griego because Plaintiff previously filed a grievance concerning this encounter but didn't mention, in any of his grievance documents, that Griego had ordered the search in retaliation for the Hawaii Lawsuit. (Doc. 56 at 2-3.) This argument is unavailing. Although the discrepancy between Plaintiff's grievance forms and his claims in this lawsuit may provide good fodder for cross-examination at trial, Defendants have not identified any legal authority showing that his claims in this lawsuit may be disregarded, for summary judgment purposes, because they are subject to impeachment. *See generally Parker v. Arizona*, 2019 WL 2136290, *4-7 (D. Ariz. 2019) (discussing the "sham affidavit" rule and noting that "the general consensus seems to be that sworn statements made in prior proceedings may trigger the doctrine while unsworn statements may not").

of assisting other inmates with preparing legal work" in violation of SCC policy. (*Id.* ¶¶ 44-46; Doc. 38-3 at 7 ¶¶ 48-51; Doc. 38-4 at 6-7 ¶¶ 40-44.)

Plaintiff contends that although some of his personal property and legal materials were returned to him on April 7, 2016, "Plaintiff's two adult magazines and the Legal Work Product [from the Hawaii Lawsuit] were confiscated, Plaintiff's photo album was damaged, and the typewriter ribbon cartridge contained in Plaintiff's typewriter was replaced with an effectively empty cartridge." (Doc. 51 ¶¶ 184, 186; *see also* Doc. 1-1 at 6-7.) Plaintiff further contends that, when Guilin returned the typewriter and some "quasi-legal materials" to him, Guilin stated that Griego had approved the return of those items and indicated that Plaintiff's cellmate's property was "collateral damage." (Doc. 1-1 at 7-8; Doc. 51 at 20.)

Defendants dispute these claims. For example, Defendants assert that Plaintiff's typewriter ribbon was not replaced during or after the search. (Doc. 38 ¶ 65.) Defendants also assert that Plaintiff's photo album was not damaged during or after the search. (*Id.* ¶ 66.) And Defendants assert that "[a]t no time did . . . Guilin indicate to Plaintiff that his cellmate's property was 'collateral damage,' nor did . . . Guilin insinuate that the cell search was targeted towards Plaintiff for an improper purpose." (*Id.* ¶ 67.)

On of the key issues in this case is whether any of the Defendants was aware of the Hawaii Lawsuit at the time of the April 2016 search. In their separate statement, Defendants assert that, "[a]t the time of the search, none of the Defendants were aware that Plaintiff was involved in any lawsuit, including his pending lawsuit against the State of Hawaii, its employees, or any related entities." (Doc. 38 ¶ 73.) In response, Plaintiff contends that "[a]t the time of the extraordinary search . . . at least Defendant GRIEGO was well aware of the [Hawaii Lawsuit]." (Doc. 51 ¶ 73.) In support of this claim, Plaintiff contends that he submitted a request for legal assistance pertaining to the suit in July 2014, which Griego personally denied in a letter. (*Id.*) Plaintiff further contends that he "and Defendant GRIEGO had at least five other discussions about the [Hawaii Lawsuit], and at least two of these discussions occurred after Plaintiff filed the [Hawaii Lawsuit] but before

April 6, 2016." (*Id.*)

On April 7, 2016, Guilin issued Plaintiff a CCA Inmate/Resident Disciplinary Report with respect to a CD player that had been confiscated during the April 6 search. (Doc. 51 ¶¶ 202-03.) Guilin also confiscated all of Plaintiff's CDs and told Plaintiff that Griego had ordered Guilin to confiscate the CDs because Plaintiff could not possess CDs without having an authorized CD player. (*Id.*) Guilin also told Plaintiff that Griego had ordered Guilin to issue the disciplinary report. (*Id.*)

Plaintiff contends that, on July 13, 2016, Griego "vulgarly berated, degraded, and threatened Plaintiff" about several complaints Plaintiff had submitted about SCC and Griego. (*Id.* ¶ 200.) Plaintiff further contends that, during this conversation, Griego "acknowledge[ed]" that he ordered or authorized the search of April 6, 2016 and "made threats to Plaintiff about the confiscation of Plaintiff's legal work." (*Id.*) Plaintiff further alleges that Griego said he knew Plaintiff was going to file a lawsuit because of the search but told Plaintiff to file only against Griego, said he "couldn't wait to get Plaintiff 'on the witness stand,'" and said that Plaintiff can sue Griego all he wants, but Plaintiff should "be careful" about suing Hawaii officials "because doing so could result in Plaintiff 'losing' further property." (*Id.*) Defendants hotly dispute Plaintiff's claims on this point and contend that "[a]t no time did . . . Griego tell Plaintiff or insinuate that he should refrain from filing lawsuits, or that his lawsuits would result in lost property." (Doc. 38 ¶ 95.)

On July 27, 2017, Plaintiff contends that he spoke with Hoskins about the April 6, 2016 search and Hoskins responded by making "statements which implicate" Griego and Weckwerth. (Doc. 51 ¶¶ 101, 201.) Hoskins allegedly told Plaintiff that Defendants "only took what was requested" from Plaintiff's legal materials and "left all of the other legal materials alone." (*Id.* ¶ 201.) Hoskins also allegedly told Plaintiff, "yeah, Hawaii got one envelope and [Plaintiff] got the rest of the envelopes back." (*Id.*) Defendants dispute these claims and assert that Hoskins did not speak to Plaintiff about the search or about his "allegedly missing legal materials" and did not tell him that his legal materials were confiscated from his cell. (Doc. 38 ¶¶ 101-02.)

## IV. Discussion

### A. First Amendment Retaliation

To prevail on a First Amendment retaliation claim, a prisoner must show that (1) a state actor took some adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the prisoner's exercise of his First Amendment rights (or that the prisoner suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997). The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

#### 1. Personal Involvement

##### a. Guilin and Weckwerth

Defendants do not dispute that Defendants Guilin and Weckwerth personally participated in the April 6, 2016 search.

##### b. Hoskins

Plaintiff alleges that Hoskins "assisted in the performance" of the April 6, 2016 search, while Defendants assert that Hoskins was aware of the cell search but did not participate in the search and did not search Plaintiff's property. These are quintessential factual disputes that preclude the entry of summary judgment. Accepting Plaintiff's facts as true, the Court finds there is a genuine dispute of material fact concerning Hoskins's personal involvement in the April 6, 2016 search.

##### c. Griego

Plaintiff alleges that Griego ordered or authorized the April 6, 2016 search. Defendants do not specifically dispute that Griego ordered or authorized the search; rather, they assert that Griego does not recall whether he authorized or ordered the search, did not participate in the search, and did not confiscate any contraband in connection with the

search. (Doc. 38 at 11.) Defendants further contend that Griego did not authorize or order Plaintiff's legal materials to be confiscated, did not replace Plaintiff's typewriter ribbon or authorize or order the replacement of the ribbon, and did not keep or prevent Plaintiff's legal materials or allowable property from being returned to him. (*Id.*) Thus, Defendants assert that Plaintiff has not shown that Griego participated in or directed a violation of Plaintiff's constitutional rights or knew of a violation and failed to act to prevent it. (Doc. 37 at 8.)

Griego is not entitled to summary judgment on this record. Plaintiff has asserted, based on his personal knowledge, that he was called to Griego's office in July 2016 "for a discussion" during which Griego "made statements and threats to Plaintiff that amounted to [Griego] admitting to ordering/authorizing" the search and confiscation "on behalf of the defendants" in the Hawaii Lawsuit. (Doc. 51 ¶ 200.) In addition, Plaintiff has asserted, based on his personal knowledge, that during a July 2017 discussion Hoskins, Hoskins "blamed" Weckwerth and Griego for the search and confiscation. (*Id.* ¶ 201.) According to Plaintiff, Hoskins stated that the Defendants involved in the search "only took what was requested," that is, legal work product, and "left all of the other legal materials alone." (*Id.*) Accepting Plaintiff's facts as true, there is a genuine dispute of material fact concerning Griego's personal involvement in the April 6, 2016 search.

### 2. Adverse Action

The next question is whether the evidence in the record could support a finding that Defendants took an adverse action against Plaintiff. *Rhodes*, 408 F.3d at 567-68. The adverse action taken need not constitute an independent constitutional violation. *Watison v. Carter*, 668 F.3d 1108 (9th Cir. 2012). "[S]ince harm that is more than minimal will almost always have a chilling effect [, a]lleging harm *and* alleging the chilling effect would seem under the circumstances to be no more than a nicety." *Rhodes*, 408 F.3d at 568 n.11. Thus, "the mere *threat* of harm can be an adverse action." *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009).

1    Defendants contend no adverse action occurred because Plaintiff's legal materials were not confiscated, the typewriter ribbon was not replaced, and "altered" magazines were confiscated as nuisance contraband. (Doc. 37 at 9.) These factual contentions, however, are disputed. Plaintiff has asserted, based on his personal knowledge, that the April 6, 2016 search resulted in, among other things, the loss and replacement of his typewriter ribbon cartridge, the loss of two adult magazines, damage to his photo album, the loss of his legal work product from the Hawaii Lawsuit, and the loss of his right to confidentiality over his legal work product. (Doc. 55 at 5-6.) Furthermore, Plaintiff received a disciplinary report for infractions arising out of his possession of some of the items confiscated during the search and pleaded guilty to one of the charges. (Doc. 38-1 at 33; Doc. 51 ¶ 203.) Accordingly, there is a genuine dispute of material fact concerning whether Defendants took an adverse action against Plaintiff. *Cf. Ray v. Maceri*, 2016 WL 10770168, *7 (D. Ariz. 2016) ("Defendant . . . does not cite to any cases from this circuit holding that a cell search can never support a First Amendment retaliation claim. Therefore, construing the facts in the light most favorable to Plaintiff, the record supports that the cell search and destruction of legal documents was an adverse action."); *Cejas v. Paramo*, 2017 WL 1166288, *6 (S.D. Cal. 2017) ("[A]lthough cell searches are a routine part of prison life, a cell search may nonetheless constitute an adverse action, as such an action need not be an independent constitutional violation. An otherwise permitted action can be the basis for a retaliation claim if performed with a retaliatory motive and lacking a legitimate correctional goal.") (citation omitted).

### 3. Retaliatory Motive

To survive summary judgment on a retaliation claim, a plaintiff must put forth evidence of retaliatory motive. *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). Thus, here, Plaintiff must show that his filing of the Hawaii Lawsuit was "the 'substantial' or 'motivating' factor" behind Defendants' conduct. *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). To show the presence of a retaliatory motive on a motion for summary judgment, Plaintiff need only "'put forth evidence of retaliatory motive that,

taken in the light most favorable to him, presents a genuine issue of material fact as to'" Defendants' intent in ordering, authorizing, or conducting the April 6, 2016 search. *Brodheim*, 584 F.3d at 1271 (quoting *Bruce*, 351 F.3d at 1289). Evidence of retaliatory motive may include the timing of the adverse action. *Bruce*, 351 F.3d at 1288.

Defendants argue that Plaintiff's cell was not searched *because of* the Hawaii Lawsuit. (Doc. 37 at 10.) They contend that none of the Defendants even knew about the Hawaii Lawsuit at the time of the search, "thus negating any causal nexus between the alleged confiscation of Plaintiff's legal materials" and his previous lawsuit. (*Id.* at 11.) Defendants also point out that the search occurred on April 6, 2016, more than 13 months after Plaintiff filed the Hawaii Lawsuit. (*Id.*) Thus, they assert, there is "insufficient temporal proximity between the protected conduct and the alleged retaliation, and the timing of the search does not support an inference of motive. (*Id.*)

Defendants further argue that Plaintiff has not alleged, nor can he prove, that any Defendant expressed opposition to the Hawaii Lawsuit, that any Defendant harbored animus toward him because of the Hawaii Lawsuit, or that the filing of the Hawaii Lawsuit would have engendered retaliatory animus on the part of Defendants. (*Id.* at 12.) Defendants also assert that Plaintiff fails to show that the reason for the alleged confiscation, "if it indeed occurred," was pretextual or false. (*Id.*)

Plaintiff has not presented any evidence that Defendants Weckwerth, Guilin, or Hoskins knew about the Hawaii Lawsuit. Indeed, Plaintiff appears to tacitly acknowledge this by asserting that "at least" Griego knew about the Hawaii Lawsuit. Guilin's alleged remark about Plaintiff's cellmate's property being "collateral damage" does not support an inference that Guilin knew, at the time of the search, that it had occurred *because of* the Hawaii Lawsuit, and Plaintiff has not provided evidence to support an inference that any other named Defendant acted with any other retaliatory motive. Accordingly, there is no genuine dispute of material fact concerning whether Weckwerth, Guilin, or Hoskins acted with a retaliatory motive. The Court will therefore grant summary judgment on Count Three as to Weckwerth, Guilin, and Hoskins.

In contrast, Plaintiff has demonstrated a disputed issue of material fact concerning whether Griego knew about the Hawaii Lawsuit and expressed hostility toward the Hawaii Lawsuit. The question, then, is whether a reasonable juror could conclude that Griego's knowledge and hostility was a "substantial" or "motivating" factor behind the alleged decision to order the search. Defendants are correct that the 13-month delay between the filing of the lawsuit and the search significantly weakens Plaintiff's position on this point. However, Plaintiff has averred that he had a conversation with Griego in July 2016 during which Griego essentially admitted to ordering the search in retaliation for the Hawaii Lawsuit. (Doc. 51 ¶ 200.) It is not the Court's role, at summary judgment, to decide whether Plaintiff's disputed account of this alleged conversation is credible. *Anderson*, 477 U.S. at 255; *Deppe v. United Airlines*, 271 F.3d 1262, 1266 (9th Cir. 2000). And if Plaintiff's account is accepted as true, it demonstrates a genuine dispute of material fact concerning whether Griego acted with a retaliatory motive.

### 4. First Amendment Activities Chilled

The next inquiry is whether Plaintiff's First Amendment activities were chilled or silenced. *Rhodes*, 408 F.3d at 567-68. "[A]n objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill *or* silence a personal of ordinary firmness from future First Amendment activities.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 568-69).

Defendants contend that Plaintiff's allegations do not show his First Amendment rights were chilled. (Doc. 37 at 14.) They assert that because Plaintiff cannot prove his legal materials were confiscated or that his typewriter ribbon was replaced, he cannot prove he was harmed, let alone that Defendants' acts chilled or silenced "a person of ordinary firmness." (*Id.*)

The Court has already found there is a genuine dispute of material fact concerning whether Plaintiff has proved he was subjected to an adverse action. Thus, Defendants' focus on whether Plaintiff's First Amendment activities were subjectively chilled is

misplaced. Accepting Plaintiff's facts as true, the Court finds there is a genuine dispute of material fact concerning whether Griego's alleged actions would chill or silence a person of ordinary firmness.

### 5. Legitimate Penological Purpose

Finally, the Court must consider whether there was a legitimate penological purpose for the April 6, 2016 search. *Rhodes*, 408 F.3d at 567-68. Plaintiff bears the burden of proving the absence of legitimate correctional goals for the conduct of which he complains. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). It is clear that Defendants have a legitimate penological interest in institutional safety and security. In addition, courts must "evaluate retaliation claims in light of" the concerns over "excessive judicial involvement in day-to-day prison management" and "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* at 807. However, if Defendants abused the search procedure "as a cover or a ruse to silence and punish" Plaintiff because he filed the Hawaii Lawsuit, they cannot assert that the search served a valid penological purpose, even if the search ultimately revealed that Plaintiff possessed contraband. *Bruce*, 351 F.3d at 1289. Other courts have held that prison officials may not defeat a retaliation claim on summary judgment "simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right." *Id.* (citing cases).

Plaintiff alleges that Griego ordered and authorized the April 6, 2016 search in retaliation for his filing of the Hawaii Lawsuit. Plaintiff contends the justification for the search was mere "pretext" because the adult magazines were not "altered" and the term "nuisance contraband" is neither used nor defined in SCC policies. Defendants argue that Guilin and Weckwerth confiscated only the CD player and CDs and "nuisance contraband," including "altered" magazines and excess, blank facility forms. (Doc. 37 at 5-6.) Defendants assert the altered magazines and forms were properly confiscated as nuisance contraband for the legitimate penological purpose of preventing prisoners from

accumulating papers and trash in their cells, which could pose a fire or safety hazard, infringe on the rights of a prisoner's cellmate, or create a security risk. (*Id.* at 13.)

The Court has found there is a genuine dispute of material fact concerning retaliatory motive. The Court further finds that Defendants' argument—that Plaintiff's property was seized as "nuisance contraband"—merely "articulat[es] a general justification" for the search process. Accordingly, there is a genuine dispute of material fact concerning whether Griego had a legitimate penological purpose in allegedly ordering or authorizing the April 6, 2016 search. The Court will therefore deny summary judgment with respect to Griego on Count Three.

### B. Free Speech Claim under Arizona Constitution

In Count Seven of the Complaint, Plaintiff alleges that Guilin, Weckwerth, Hoskins, and Griego violated his right to free speech under the Arizona Constitution[10] by retaliating against him for his exercise of speech, that is, by filing the Hawaii Lawsuit. In their motion and reply, Defendants identity only one reason why Count Seven should be rejected—because it fails "for the same reasons" as Count Three. (Doc. 37 at 16-17; Doc. 56 at 10-11.)

The Court agrees that Guilin, Weckwerth, and Hoskins are entitled to summary judgment on this basis. However, as discussed above, the Court does not conclude that Griego is entitled to summary judgment on Count Three. And because Defendants' motion does not articulate any additional reasons why Count Seven should be rejected as to Griego, this would ordinarily mean that Griego's request for summary judgment on Count Seven must be denied.

Nevertheless, under Rule 56(f)(2) of the Federal Rules of Civil Procedure, the Court may, "[a]fter giving notice and a reasonable time to response, . . . grant the motion on grounds not raised by a party." Here, the Court wishes to point out that the Arizona Supreme Court has never held that Article 2, Section 6 creates a private right of action for

---
[10] Article 2, Section 6 of the Arizona Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."

- 16 -

damages. *Cesare v. County of Pima*, 2015 WL 13741218, *24 (D. Ariz. 2015). Moreover, and as other members of this Court have recognized, deciding whether to recognize such a private right of action is a "novel issue of state law" that "has important public policy ramifications which the state court should be involved in deciding." *Valencia Kolb Properties v. Pima County*, 2014 WL 12575855, *7 (D. Ariz. 2014). For these reasons, the Court is inclined to either grant summary judgment to Griego on Count Seven, because it is a non-existent cause of action, or decline under 28 U.S.C. § 1367(c)(1) to exercise supplemental jurisdiction over this "novel issue of state law" and therefore sua sponte dismiss it. *Id. See also Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1999) (noting that district court may, but is not required to, sua sponte consider dismissal of state claims pursuant to § 1367(c)). Before pursuing either course of action, however, the Court will provide the parties with an opportunity to submit further briefing.

### C. Conversion

In Count Nine, Plaintiff alleges that Weckwerth, Hoskins, Guilin, Griego, and CoreCivic committed the tort of conversion with respect to property that was confiscated or damaged during the April 6, 2016 search.

In Arizona, "[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Miller v. Hehlen*, 104 P.3d 193, 203 (Ariz. Ct. App. 2005). If those elements are shown, the Court "must then consider the seriousness of the interference and whether the offending party must pay full value." *Id.* "An action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document." *Id.* Conversion also requires "conduct intended to affect property of another." *Id.* The intent required is "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Sterling Boat Co. v. Ariz. Marine, Inc.*, 653 P.2d 703, 706 (Ariz. Ct. App. 1982).

In their motion, Defendants identity a shotgun list of reasons why they are entitled to summary judgment on Count Nine. First, they contend that Plaintiff hasn't specifically identified the "legal materials" he contends were confiscated during the search. (Doc. 37 at 17.) Second, they contend that Plaintiff cannot "prove, aside from mere conjecture, that any of the Defendants *intentionally* 'exercise[d] dominion or control' over his property inconsistent with his rights." (*Id.* at 17.) In a related vein, Defendants contend Griego can't be held liable for conversion because he didn't personally participate in the search. (*Id.* at 17 n.18.) Third, Defendants contend that "Plaintiff cannot proffer evidence showing that his typewriter ribbon was empty upon return, that it was only half empty prior to the search, or that it was replaced by Defendants." (*Id.* at 17.) And fourth, Defendants contend that "Plaintiff did not have the right to possess nuisance contraband, excess property, trash, or altered magazines pursuant to SCC policy and for legitimate penological purposes." (*Id.* at 18.)

These arguments are unavailing. As an initial matter, the Supreme Court has indicated that "conversion" is a "state tort remed[y]" that is potentially available to a prisoner to seek "redress [for] the deprivation" of property that is destroyed during a cell search. *Hudson v. Palmer*, 468 U.S. 517, 520 & n.1 (1984). *See also Williams v. O'Grady*, 1987 WL 19163, *1 (N.D. Ill. 1987) ("If the guards wrongfully confiscated Williams' cigarettes as alleged, then he has an adequate state postdeprivation remedy for his claim. Illinois recognizes the common law tort of conversion . . . ."). Thus, Plaintiff's invocation of this theory of recovery isn't invalid on its face—whether Defendants are entitled to summary judgment turns on whether there are material issues of disputed fact.

On the merits, the Court is not persuaded by Defendants' argument that Plaintiff was required to precisely identify and describe the contents of each allegedly confiscated legal document in order to survive summary judgment. *Universal Marketing & Entertainment, Inc. v. Bank One of Ariz., N.A.*, 53 P.3d 191 (Ariz. Ct. App. 2002), which is the only case cited by Defendants on this point, is easily distinguishable—the issue there was whether unsegregated funds the plaintiff had deposited into a non-party's general bank

account were subject to conversion. *Id.* at 193. Defendants appear to rely on *Universal Marketing* for the proposition that "[a]n action for conversion must be supported by title in the plaintiff and there must be a means of identification of it as a specific chattel for it to constitute the subject of conversion." *Id.* (citation omitted). Although it may have made sense to require the plaintiff in *Universal Marketing* to identify the specific money within the general account that belonged to it, there is no suggestion in this case that the "legal work product" allegedly confiscated from Plaintiff's cell actually belonged to somebody else. Therefore, *Universal Marketing* is inapposite.

As for Defendants' second argument—that none of them "intentionally" exercised dominion or control over the disputed property—Defendants appear to view the intent element as being tantamount to bad faith. However, the case cited in Defendants' motion on this point, *Sterling Boat,* adopts the opposite construction. It holds that "the intent required . . . is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." 653 P.3d at 706 (quotation omitted). Given Defendants' failure to develop this argument in any more depth, it cannot provide the basis for granting summary judgment to them.

Finally, Defendants' remaining arguments—that they didn't actually remove the typewriter ribbon and only removed "nuisance contraband"—are also unavailing. Plaintiff has averred, based on his personal knowledge, that the ribbon was missing when the typewriter was returned to him. There may be other reasons why a conversion claim premised on the missing typewriter ribbon may fail, but this isn't one of them (at least at the summary judgment stage). And with respect to the "nuisance contraband" argument, this term does not appear in the prison's manual and Plaintiff has raised disputed issues of fact concerning what exactly it means. For all of these reasons, there are disputed fact issues bearing upon the conversion claim that preclude summary judgment.

…

…

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 37).

(2) Defendants' Motion for Summary Judgment (Doc. 37) is **granted in part** and **denied in part**. The Motion is **granted** with respect to the First Amendment retaliation claim in Count Three against Defendants Weckwerth, Hoskins, and Guilin. The Motion is **denied** with respect to the First Amendment retaliation claim in Count Three against Defendant Griego and with respect to the conversion claim in Count Nine.

(3) As for Count Seven, the parties may submit an additional brief, not to exceed ten (10) pages, within 21 days of the issuance of this Order addressing whether Defendants are entitled to summary judgment and/or dismissal of Count Seven due to the absence of any Arizona case recognizing a private right of action for damages under Article II, Section 6 of the Arizona Constitution.

Dated this 23rd day of September, 2019.

Dominic W. Lanza
United States District Judge